UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSE M. GONZALEZ,

                                   Plaintiff,            <u>DECISION AND ORDER</u>

                        v.                               16-CV-6652L

CITY OF ROCHESTER, et al.,

                                   Defendants.
_____


       Plaintiff Jose Gonzalez commenced this action by filing a complaint in New York State

Supreme Court, Monroe County, on September 20, 2016, asserting federal and state law claims

against defendants the City of Rochester ("City"), the Rochester Police Department ("RPD"),

RPD Officer William Danno, and one or more unnamed, "John Doe" RPD officers.  Defendants

removed the action to this Court on September 28, 2016, on the basis of federal question

jurisdiction.

       Defendants have moved for summary judgment dismissing the complaint.  Plaintiff has

filed papers in opposition to the motion, and has cross-moved for leave to file an amended

complaint.


                              **FACTUAL BACKGROUND**

       At around 10:45 p.m. on August 4, 2015, RPD received several 911 calls of a man

brandishing a long gun and threatening to shoot people in the vicinity of 34 Texas Street in

Rochester.  In response to those calls, nearly four dozen RPD officers arrived at the scene.

Officers blocked the ends of the street with police cars, and set up a perimeter to prevent the suspect from fleeing.

During a search of the area, officers discovered a duffel bag containing a shotgun, shotgun ammunition, and two 50-count boxes of 9mm ammunition, one of which had nine rounds missing.  No 9mm weapon was found in the bag.

At some point, a K-9 officer was summoned.  Defendant Danno arrived with "Gunner," a four-year-old German Shepherd mix dog weighing about 70 pounds.  Gunner was trained in tracking and pursuit, and drug detection.  Danno had been with the RPD K-9 unit for about 19 years and was a trainer for both the dogs and their handlers.

Based on where they had found the duffel bag, and where the suspect had last been seen, RPD officers asked Danno to use Gunner to look for the person in an area around 23 Texas Street.  As a safety precaution, Danno took Gunner two houses to the east, to 17 Texas Street, with the intention of moving west from the back yard of that house.  At that point, Danno had Gunner tethered to a lead.

As they began moving west, in almost total darkness (save for the light from Danno's flashlight), Gunner began barking and jumping, indicating that he had "alerted" to the presence of a human.  Defendants allege that Danno then shouted, "Rochester Police canine, show yourself and come out or I will release the dog!," and twice repeated that warning.  About fifteen seconds after the third warning, Danno released Gunner, who immediately sped off and jumped over a nearby fence.  Danno ran after Gunner.

Within seconds after giving chase, Danno heard human screams mixed with Gunner's barking.  He ran toward the sounds, and alleges that as he did so, he shouted several times,

-2-

"Stand still!"  When he caught up with Gunner (which he estimated might have taken five to ten seconds (Danno Tr. at 123), Danno found the dog biting and holding a man by the man's left arm.  That man–the plaintiff–claims he had been sleeping, or at least resting, in a wooded area between some railroad tracks and the back of a repair shop near the corner of Texas and Child streets.

Plaintiff had recently been released on parole from state prison.  As a condition of parole, he was supposed to reside at an approved residence on Lyell Avenue, and to observe an 8 p.m.-to-8 a.m. curfew.  Plaintiff testified at his deposition that on the day in question, he had a falling out with his housemate, and went to visit an acquaintance a few blocks from Texas Street. When she declined to allow him to spend the night at her residence, he began walking northward on Child Street, and when he spotted the brushy area near the repair shop, he decided to stop there to rest.

Exactly what happened immediately prior to and during plaintiff's encounter with Gunner and the officers is unclear, other than that Gunner bit plaintiff on the arm, the officers arrived, handcuffed plaintiff, and led him away.

Plaintiff testified that he did not hear any warnings before his encounter with Gunner.  He alleges that he awoke to the sound of someone or something walking toward him through the brush and fallen twigs.  He stood up and saw a dog, which, he claims, almost immediately attacked him, biting him on the arm.  *See* Pl. Tr. (Def. Ex. G) at 13; (Def. Ex. H) at 14.

Danno has testified that it might have taken "five to ten seconds maybe" for him to catch up to Gunner.  Danno Tr. at 123.  When he did so, Danno saw Gunner "engaging the suspect on

his arm" (presumably meaning biting plaintiff's arm), and plaintiff "flailing" at Gunner.  Danno

testified that plaintiff was "hunched down ... trying ... to get the dog off of him."  *Id.* at 122.

Danno alleges that when he arrived at the scene, he began shouting at plaintiff to stand

still, because Gunner was trained to let go if the suspect stops resisting and his handler gives the

"release" command.  *Id.* at 122.  Danno continued telling plaintiff to stop resisting the dog and to

stand still.  Danno stated that at some point plaintiff "d[id] go onto the ground."  *Id.* at 123.

Danno said that at that point, he commanded Gunner to come back to a heel, and that

when Gunner did so, Officer Kester, who had just arrived, went to apprehend plaintiff.  *Id.* at

126.  Danno stated that plaintiff was lying on the ground with his hands underneath his body,

roughly in a fetal position.  *Id.* at 127.

Though plaintiff's and Danno's testimony about these events unquestionably differ in

some respects, the parties agree that at some point, plaintiff ended up face down on the ground.

Plaintiff testified that the two officers began shouting at him, and "started to beat [him] up on the

back."  Eventually one of the officers took the dog away, while the other officer handcuffed

plaintiff.  Def. Ex. G at 14-15.

The officers then took him out to a nearby street (either partially dragging him or walking

him, depending on whose testimony is to be believed), where someone informed the officers that

the actual suspect had already been apprehended.  Plaintiff alleges that the officers then removed

his handcuffs and told him he was free to go.  When plaintiff said, "What about my arm?," and

they saw that his arm was injured from the dog bite, the officers called for an ambulance, and he

was taken to a hospital for treatment.  *Id.* at 15-16.

-4-

Based on these facts, plaintiff has asserted five causes of action.  The first, brought under New York law, is for negligence.  The details of the claim are unspecific, but simply allege that the incident "was caused by the intentional, careless, reckless, and/or negligent acts and omissions" of the defendants.  Complaint ¶ 24.

The second cause of action is for "intentional torts," including "assault, battery, intentional infliction of personal injuries, unjustified use of physical force during apprehension and detainment, brutal police conduct, and undue force."  *Id.* ¶ 27.

The third cause of action is brought against the City and the RPD under 42 U.S.C. § 1983, and relates to the RPD's use of police dogs.  Plaintiff alleges that the "governmental policy, procedure, and practice" of the City and the RPD concerning the use of police dogs caused or contributed to this incident, leading to a violation of plaintiff's rights under the Fourth and Fourteenth Amendments.  Plaintiff also alleges "a general failure to supervise the K-9 officers, failure to select psychologically fit officers for the K-9 unit, and failure to properly train the officers in the proper handling of a police dog."  *Id.* ¶ 33.

The fourth cause of action is brought against Danno and the "John Doe" defendants, and alleges that they used excessive force, both in regard to the use of a police dog, and directly when taking plaintiff into custody.  *Id.* ¶ 44.  The fifth cause of action, asserted against the RPD, Danno and the John Doe defendants, is based on false arrest and false imprisonment.  *Id.* ¶ 48.

Based on each of these claims, plaintiff seeks damages in an unspecified amount.  *Id.* at 10, 11.

**DISCUSSION**

**I. Plaintiff's Motion for Leave to Amend**

In opposition to defendants' motion for summary judgment, plaintiff has requested leave to file an amended complaint, and has submitted a proposed amended complaint. Pl. Ex. O. The proposed amended complaint adds some factual allegations, adds a claim of strict liability to the first cause of action, generally restates the third cause of action, and names Kester in place of the "John Doe" defendants in the original complaint. Plaintiff's only stated basis for the motion is that "defendants claim that the plaintiff's Complaint is confusing" and that the amended complaint will "alleviate the defendants' confusion" and "clarify the issues" in the case. Pl. Mem. (Dkt. #13-11) at 10, 11. Defendants oppose the motion, arguing that plaintiff is improperly seeking to defeat defendants' summary judgment motion by belatedly attempting to add more claims, allegations and issues into the case.

Pursuant to Rule 15(a)(2) of the Federal Rule of Civil Procedure, courts "should freely give [a moving party] leave [to amend] when justice so requires." Leave to amend a complaint should be denied only "if there is delay, bad faith, futility, or prejudice to the non-moving party." *Hosking v. New World Mortg., Inc.*, 602 F.Supp.2d 441, 445 (E.D.N.Y. 2009) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The party opposing a motion for leave to amend bears the burden of establishing that the amendment should be denied. *See Joinnides v. Floral Park-Bellerose Union Sch. Dist.*, No. 12-CV-5682, 2015 WL 1476422, at *9 (E.D.N.Y. Mar. 31, 2015) ("With respect to the Rule 15(a) factors, [t]he party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial or futile") (internal quote omitted). It lies "within the sound discretion of the district court to grant or deny leave to

amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (internal citation omitted).

"Where there has been excessive delay before seeking to serve the amended complaint, leave to do should be denied absent a convincing explanation for the delay." *Goss v. Revlon, Inc.*, 548 F.2d 405, 407 (2d Cir. 1976). "When the motion [to amend] is made after discovery has been completed and a motion for summary judgment has been filed, leave to amend is particularly disfavored because of the resultant prejudice to defendant." *Ansam Assoc, Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985).

Courts therefore "routinely deny attempts to amend after discovery has closed and the non-movant has already filed summary judgment papers." *Kennedy v. Caruso*, No. 19-CV-260, 2020 WL 4605222, at *1 (D.Conn. Aug. 11, 2020). *See*, *e.g.*, *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726-27 (2d Cir. 2010) (affirming denial of leave to amend complaint to add new claim where discovery had closed, opponent "had already filed summary judgment papers," and "impact of the proposed new claim on the existing proceedings would have been substantial" and would have "significantly delayed the resolution of the dispute" (internal quotation marks and alterations omitted)); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (in affirming denial of leave to amend complaint, noting length of delay, that discovery had been completed and summary judgment motion was pending); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) ("A proposed amendment ... [is] especially prejudicial ... [when] discovery had already been completed and [nonmovant] had already filed a motion for summary judgment").

To the extent that the proposed amended complaint seeks to add additional factual allegations or claims, I agree with defendants that such an amendment would be improper. Plaintiff has offered no sound justification for his undue delay in presenting the motion. Contrary to plaintiff's arguments, defendants have not stated that they are "confused" by the original complaint, such that they seek some clarification; the gist of their argument seems to be that the complaint lacks merit, and that no amount of "clarification" will save it.

There is one respect, however, in which the Court will permit the complaint to be amended. The original complaint named Officer Danno and one or more "John Doe" defendants. The proposed amended complaint names Danno and Kester as individual defendants, and does not assert claims against any "John Does." Defendants have not opposed that aspect of the motion.

It is not unusual for pleadings to be amended to identify defendants who were formerly sued as "John Doe." *See*, *e.g.*, *Lyons v. McGinnis*, 04-CV-6157, 2006 WL 1389782, at *5 (W.D.N.Y. May 19, 2006). As reflected in defendants' summary judgment motion, it became clear during discovery in this action that the only two officers involved in the underlying incident were Danno and Kester. *See* Def. Mem. (Dkt. #11-20) at 16-17 (stating that "Officers Danno and Kester ... were the only Officers involved" in this incident). Since I see no prejudice to defendants by permitting the amendment in that regard, the Court will grant plaintiff's motion to amend, insofar as it seeks to name Kester as a defendant.

-8-

**II. Defendants' Motion**

   **A. Claims against the RPD**

Defendants contend that all of plaintiff's claims against the RPD must be dismissed. I agree. Where constitutional claims are alleged against a municipality, claims against underlying agencies, such as the RPD, are typically dismissed as redundant. See *Taylor v. City of Rochester*, __ F.Supp.3d __, 2020 WL 2177453, at *3 (W.D.N.Y. 2020) (citing cases); *Yevstifeev v. Steve*, 860 F.Supp.2d 217, 224 (W.D.N.Y. 2012). The claims against the RPD are therefore dismissed.

   **B. Negligence Claim (First Cause of Action)**

Defendants contend that the first cause of action should be dismissed on the ground that a negligence claim is not cognizable in a § 1983 action, particularly where the facts alleged show purely intentional conduct.

   "When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Naccarato v. Scarselli*, 124 F.Supp.2d 36, 45 (N.D.N.Y. 2000). "The question is not of alternate pleadings arising out of the same conduct, but of a single set of facts which if proved can only provide the basis for one or more intentional torts (which themselves may be alleged alternatively)." *Vilkhu v. City of New York*, No. 06-CV-2095, 2008 WL 1991099, at *9 (E.D.N.Y. May 5, 2008); *see also Bah v. City of New York*, No. 13 Civ. 6690, 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014) ("Though litigants may allege alternate, or inconsistent, claims in a pleading, when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed") (citing Fed. R. Civ. P. 8(d)).

Based on plaintiff's allegations, this case falls squarely within the parameters of that rule. Plaintiff's claims here are based on nothing but intentional conduct by the police officers. Simply put, the claim is fundamentally at odds with, and is unsupported by, plaintiff's factual allegations.  Accordingly, plaintiff's first cause of action must be dismissed.  *See Forbes v. City of Rochester*, __ F.Supp.3d __, 2020 WL 1963139, at *7 (W.D.N.Y. 2020) ("Plaintiff's negligence claim against Bongiovanni and DiMauro ..., premised on the same intentional conduct underlying his excessive force, assault, and battery claims, must be dismissed"); *Universal Calvary Church v. City of New York*, No. 96 Civ. 4606, 2000 WL 1745048, at *12 (S.D.N.Y. Nov. 28, 2000) (granting summary judgment with respect to the plaintiffs' negligence claim because the undisputed evidence established intentional conduct for assault and battery, rather than negligence).[1]

### C. False Arrest (Fifth Cause of Action)

In his fifth cause of action, plaintiff asserts a claim for false arrest and false imprisonment against all the defendants.  Defendants contend that this claim should be dismissed, because the Court should find as a matter of law that the officers had reasonable suspicion and probable cause to at least detain plaintiff long enough to determine if he was the suspect for whom they were searching.[2]

---

[1] I note that in his proposed amended complaint, plaintiff adds to the first cause of action a theory of strict liability, based on the allegation that defendants knew or should have known of Gunner's "viscous [sic] propensities."  (Dkt. #13-16 at 8, ¶ 33.)  Even assuming that such a claim could be brought with respect to a police dog, discovery in this action is long closed, and plaintiff has submitted no evidence to support such a claim.  *See Thurber v. Apmann*, 91 A.D.3d 1257, 1258 (3d Dep't 2012) ("Nor do we find that the formal police training of the dogs constitutes either evidence of viciousness or provided defendant with notice of such").

[2] Although the complaint uses both terms, false arrest and false imprisonment are essentially the same under New York law and § 1983.  *See Rizk v. City of New York*, __ F.Supp.3d __, 2020 WL 2734361, at *10 (E.D.N.Y. 2020).

Defendants contend that plaintiff "was not actually arrested, but only detained ...," Def. Reply Mem. at 13, but they also contend that the officers had probable cause to arrest him, *see id.* at 13-14.  The distinction is not insignificant.  "Reasonable suspicion" of criminal activity may justify a so-called *Terry* stop, *i.e.*, a brief detention to determine whether criminal activity is going on, but probable cause is required to support an arrest.  *See Rizk v. City of New York*, __ F.Supp.3d __, 2020 WL 2734361, at *10 (E.D.N.Y. 2020).

While the two standards are not capable of precise definition, *see Ornelas v. United States*, 517 U.S. 690, 695 (1996) ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible"), they are different.  "In general, probable cause to arrest exists when the officers have knowledge ... of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

In contrast, "[t]he reasonable suspicion standard is 'not high' and is 'less demanding than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity may be afoot.'"  *United States v. Cuello*, 811 Fed.Appx. 38, 40 (2d Cir. 2020) (quoting *United States v. Singletary*, 798 F.3d 55, 59-60 (2015)).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is ... obviously less than is necessary for probable cause."  *Prado Navarette v. California*, 572 U.S. 393, 397 (2014).

In determining whether a particular detention was justified by reasonable suspicion, the court looks at "the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training."

-11-

*Singletary*, 798 F.3d at 60.  "These circumstances may be 'as consistent with innocence as with guilt.'"  *Cuello*, 811 Fed.Appx. at 40 (quoting *Singletary*, 798 F.3d at 60).

Even viewing the record in the light most favorable to plaintiff, I conclude that under all the circumstances, these events–which happened quickly, if not chaotically–did not rise to the level of an arrest, and that the officers' brief detention of plaintiff was justified and supported by their reasonable suspicion of criminal activity.  Plaintiff's claim of false arrest therefore fails.

In conducting this analysis, the Court must take care to "evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).  What the officers knew here was that they were searching for a man who had been threatening people with a gun, and who was likely hiding under cover of darkness, somewhere in the area within the perimeter established by the RPD. They also had reason to think that the suspect may have been armed; although a shotgun had been found in the duffel bag discovered by the police, the bag also contained boxes of 9mm ammunition, with several rounds missing, but no 9mm firearm.  Under those circumstances, it was entirely reasonable for the officers to detain plaintiff, who had apparently been in a semi-wooded area, at night, near where a possible shooter had been reported, for no apparent reason.[3]

---

[3] At the risk of giving what should be a non-issue more attention than it deserves, the Court notes that both parties' papers devote some space to why plaintiff was sleeping where he was.  Defendants in particular have attempted to show that plaintiff was not "lawfully" sleeping out of doors, in that location, because he was on parole and under curfew restrictions.

All of that is irrelevant to the present motion.  Neither the officers nor the dog were looking for a parole violator, nor were they aware of plaintiff's parole status.  They were looking for a man who had been threatening people with a gun.  Whether evidence may be introduced at trial concerning why plaintiff was where he was, when he was found, is a matter for another day, but it is of no relevance here.

That the officers handcuffed plaintiff did not transform his detention into an arrest. "[E]ven though handcuffs are generally recognized as a 'hallmark of a formal arrest,' not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness.  The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat."  *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (quoting *United States v. Newton*, 369 F.3d 699, 676) (2d Cir. 2004)).  *See*, *e.g.*, *United States v. Fiseku*, 915 F.3d 863, 869-74 (2d Cir. 2018) (finding no constitutional violation where officers handcuffed three suspects whom they had found in the middle of the night in a remote, wooded location under suspicious circumstances); *Newton*, 369 F.3d at 675 (concluding that it was objectively reasonable for police to handcuff defendant inside his home while officers searched for a firearm, where officers were in the home in response to a report that defendant illegally possessed a firearm and had recently threatened to kill his mother and her husband).

In addition, even if plaintiff's detention did amount to an arrest, the officers would be entitled to qualified immunity from liability, since they could reasonably have believed that probable cause existed.  *See Mastromonaco v. County of Westchester*, No. 15 CV 10166, 2018 WL 4042111, at *5 (S.D.N.Y. Aug. 23, 2018) ("even if the arrest was not supported by probable cause, a police officer will still prevail in a false arrest case under the doctrine of qualified immunity if there was 'arguable probable cause' to arrest") (citing *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)).

When found, plaintiff was not sitting in a back yard in a lawn chair; from his own testimony it is apparent that he chose the spot where he was found precisely because it was at least partially hidden from view, among trees, bushes and undergrowth.

While that in itself is not necessarily indicative of wrongdoing, it bears repeating that the Court must attempt to put itself into the shoes of the officers, who were searching for a potentially armed and dangerous suspect who, as far as they knew, was still at large and likely hiding nearby. Looking at the situation from the perspective of the officers, in light of all the circumstances known to them at the time, it was reasonable for them to believe that they had probable cause to arrest plaintiff. Even if they were mistaken in that belief, they are therefore entitled to qualified immunity. *See Ekukpe v. Santiago*, __ Fed.Appx. __, 2020 WL 4743501, at *3 (2d Cir. 2020) ("a defendant is entitled qualified immunity as matter of law 'if the evidence, viewed in the light most favorable to [the plaintiff], established that it was objectively reasonable for [the defendant] to believe he was justified in making the arrest'") (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001).

For all these reasons, the Court concludes that plaintiff's claim of false arrest must be dismissed. Since a claim for false arrest or unlawful imprisonment brought under § 1983 is substantially the same as a claim for false arrest under state law, *see Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003); *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003), the fifth cause of action is dismissed in its entirety.

### D. Excessive-Force Claims

#### 1. Dog Bite

There are two aspects to plaintiff's claim of excessive force.  First, he alleges that defendants' use of a police dog constituted excessive force that caused him physical injury.  Second, he alleges that the officers themselves used excessive force when they handcuffed plaintiff and physically removed him from the scene.  Based on these allegations, plaintiff asserts claims under both New York law (his second cause of action) and § 1983 (his fourth cause of action).

As to the use of the dog, there is no dispute that plaintiff was injured.  Gunner bit him on the arm, and it was apparently that injury that led to his being taken to a hospital for treatment.  Photographs taken at the hospital where plaintiff was taken for treatment show deep lacerations in his forearm, with wide openings in the skin.  Pl. Ex. E.

Other material aspects of the relevant facts, however, are in dispute.  In particular, the parties disagree about whether Officer Danno issued a verbal warning before releasing Gunner.

Defendants contend that before releasing Gunner, Danno shouted, three times, "Rochester Police K-9, show yourself and come out or I will release the dog!"  Def. Rule 56 Statement (Dkt. #11-1) ¶ 10.  Danno testified that he did so, *see* Def. Ex. I at 110.  Kester testified that he heard those warnings.  *See* Ex. J  at 48-49 (stating that when he was "maybe 50 yards at the most" from the scene, he heard Danno  "screaming very loud," "police K9, ... come out").

Plaintiff has alleged, and testified, that he heard no such warnings.  He testified that the first indication he had of Gunner's approach was hearing "noise like in the bushes like somebody was approaching."  Pl. Tr. at 12.  He saw a dog, stood up, and the dog attacked him.  *Id.* at 18.

That divergence between the parties' accounts of what occurred immediately prior to Gunner's attack give rise to a material issue of fact that precludes summary judgment.

First, the Court finds that the use of a K-9 dog constituted a use of force significant enough to support an excessive-force claim. Plaintiff's arm was lacerated, and this was clearly not a *de minimis* use of force. *See Scott v. Lazure*, No. 19-cv-713, 2020 WL 2615502, at *6 (D.Conn. May 22, 2020) (concluding that "the use of a police dog constitutes, at a minimum, a significant degree of force") (citation omitted).

Second, there are stark issues of fact concerning Danno's release of the dog, and the events that ensued immediately thereafter. "Courts have consistently held that a failure to warn before the release of a K-9 ... can constitute excessive force depending on the circumstances." *Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *16 (S.D.N.Y. Dec. 17, 2015). Given the parties' dispute about whether any prior warnings were given, the Court cannot resolve those issues on a motion for summary judgment. *See Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir.1998) (evidence in dispute regarding whether officer gave verbal warning before police dog attack); *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991) (reversing summary judgment for police officers and county, where district court improperly credited officers' testimony that K-9 officer issued loud verbal warnings before releasing dog).

Defendants attempt to discredit plaintiff's account of the events leading to his arrest, by arguing that it is incredible that he was not awakened by Danno's warnings, yet was awakened by Gunner's "soft footfall on twigs ... ." Def. Supp. Mem. (Dkt. #15-2) at 3. But that argument assumes that Danno did issue the warnings in the first place. After hearing all the testimony, a jury might conclude otherwise. The evidence relating to the circumstances leading up to this

-16-

incident may provide fodder for argument at trial, by counsel for both sides, but these issues should not be decided by the Court on a motion for summary judgment.  *Id.*

### 2. Force Used by the Officers

Plaintiff alleges that "immediately after" he was attacked by Gunner, he was "subjected to additional physical assault and excessive use of force ... ."  Complaint ¶ 19.  From his deposition testimony, this appears to relate to both officers, but mostly to Kester.

To summarize plaintiff's testimony, he alleges that while Gunner was still biting him on the arm, both Danno and Kester approached him with their guns drawn.  One or both of the officers started hitting plaintiff on the back.  Plaintiff estimated this striking lasted about two minutes, a significant period of time.  Pl. Tr. at 22.  The officers, however, deny doing any such thing.

At some point, Gunner released his hold on plaintiff.  Plaintiff alleges that one of the officers (presumably Kester, since Danno was the dog handler) forcefully put his leg on plaintiff's back and handcuffed him.  Because plaintiff was in pain, and still confused about what was happening, he could not immediately get to his feet, so the officers started dragging him toward the street.  During this time, plaintiff alleges, the officers were yelling at him, telling him to "shut up," "relax," and "stand up."  Gonzalez Tr. at 19-25.

Hospital records from when plaintiff was taken for medical treatment show that he reported that the police officers had kicked him in the head, causing him to lose consciousness. Pl. Ex. N.  A photograph of plaintiff taken at the hospital shows what appear to be lacerations and possibly bruises on his left cheek and near his left eye.  Pl. Ex. F.

-17-

As stated, the officers have a far different account of these events. Danno testified that when he caught up to Gunner, he saw Gunner "engaging" plaintiff, and that plaintiff was "hunched over" and "flailing" at Gunner. Danno Tr. at 121. Danno yelled at plaintiff to stop resisting, and when after some seconds plaintiff did so, Gunner came back to Danno, whereupon Kester ran in to apprehend plaintiff. *Id.* at 126-27. Danno said he did not see Kester strike plaintiff at all, *id.* at 127.

Kester's testimony was consistent with Danno's; he testified that other than handcuffing plaintiff, the only contact he made with plaintiff was to search him for weapons. Kester Tr. at 60. Specifically, Kester testified that once plaintiff–who was face down when Gunner was called off–complied with Kester's verbal commands to put his arms out to the side, Kester handcuffed plaintiff, rolled him over onto his back and searched him for weapons. Def. Ex. J at 60. According to Kester, it took "[m]aybe 12, 13 seconds" from the time Kester told plaintiff to put his arms out to the time that Kester handcuffed him. *Id.*

As with the use of the K-9 dog, the parties' accounts of what happened during this encounter are in sharp and obvious dispute. According to plaintiff, it took about "two minutes" for the officers to handcuff him, "[a]fter they beat [him] up." Pl. Tr. at 22. According to the officers, they used very little force at all; once plaintiff complied with the direction to stop resisting the dog, the dog was called off and Kester ran over, searched plaintiff, and put cuffs on him, within a matter of seconds. The Court cannot resolve these disputes on a motion for summary judgment.

"[I]n light of the fact-specific nature of the inquiry on an excessive force claim, granting summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable

factfinder could conclude that the officers' conduct was objectively unreasonable." *Lennox v. Miller*, __ F.3d __, 2020 WL 4342247, at *3 (2d Cir. 2020) (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015)).  The Court cannot reach that conclusion here.

For the same reasons, the Court cannot find as a matter of law that the individual defendants are entitled to qualified immunity on these claims.  Though qualified immunity is often an issue for the court to determine as a matter of law, summary judgment is not appropriate if the underlying material facts are in dispute.  *See Curry v. City of Syracuse*, 316 F.3d 324, 334-35 (2d Cir. 2003) ("summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain"); *McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999) ("Where, as here, there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate").

Given the dispute between the two sides about exactly how this incident unfolded, this case well illustrates the Second Circuit's statement that "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity."  *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (internal citations and quotation marks omitted).  Defendants' motion for summary judgment as to the second and fourth causes of action is therefore denied.

### E. Third Cause of Action (*Monell* Claim)

The third cause of action alleges that the City is liable because of its policies and practices regarding the use of police dogs.[4]  Plaintiff alleges that the City failed to select "psychologically fit" officers for the K-9 unit, and that the City failed to properly train and supervise its K-9 officers.  Complaint ¶ 33.

This claim appears to be based on *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), in which the Supreme Court held that to recover against a municipality under § 1983, a plaintiff may not rely on the doctrine of *respondeat superior*, but must allege and ultimately prove facts showing that the municipality was responsible for the constitutional deprivation at issue, in the sense that the deprivation may fairly be said to have resulted from an official custom or policy of the municipality.  *See Colon v. City of Rochester*, 419 F.Supp.3d 586, 603 (W.D.N.Y. 2019).

While there is no bright-line rule for determining whether a *Monell* claim has been adequately stated, it is fair to say that plaintiff has fallen far short here, particularly given that the case has reached the summary judgment stage.  Plaintiff has done no more than submit a copy of the RPD's "General Order" concerning the use of a K-9 dog during operations, and asserted that the City's alleged failings in this regard are to blame for whatever violations may have occurred here.  Plaintiff's assertion that the RPD's policy "authorizes the use of a K-9 to attack and continually attack an innocent person," Pl. Mem. at 8, which is devoid of citation to the record,

---

[4] As pleaded, this claim is also brought against the RPD.  As stated above, the claims against the RPD have been dismissed.

might well lead one to wonder whether counsel even read the ten-page General Order before making that assertion.

Plaintiff has not shown the existence of any genuine issue of material fact as to a *Monell* claim in this case.  The third cause of action is therefore dismissed.


## CONCLUSION

Defendants' motion for summary judgment (Dkt. #11) is granted in part and denied in part.  All claims against the Rochester Police Department are dismissed.  Plaintiff's first, third, and fifth causes of action are dismissed.  In all other respects, defendants' motion is denied.

Plaintiff's cross-motion for leave to amend/correct the complaint (Dkt. #13) is granted in part and denied in part.  Plaintiff shall file an amended complaint within fourteen (14) days of the date of entry of this Decision and Order, naming Officer Jeffrey Kester in place of the "John Doe" defendants in the original complaint, and asserting only claims of excessive force, as now alleged in the second and fourth causes of action in the original complaint.  In all other respects, plaintiff's cross-motion is denied.

IT IS SO ORDERED.


_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       August 26, 2020.

-21-